**MARGARET TAYLOR FINUCANE, ESQ.**
**One PATH Plaza**
**Jersey City, New Jersey 07306**
**(201) 216-6370 – (212) 435-3415**
*Attorney for Defendant*
**Port Authority Trans-Hudson Corporation**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANNA McCLEMENT,** | **CIVIL ACTION NO.: 11-06839 (CCC)** |
| **Plaintiff,** | |
| **vs.** | |
| **PORT AUTHORITY TRANS-HUDSON CORPORATION, a wholly owned subsidiary of PORT AUTHORITY OF NEW YORK AND NEW JERSEY** | **STATEMENT OF MATERIAL FACTS PURSUANT TO L. Civ. R. 56.1** |
| **Defendant.** | |

Defendant, Port Authority Trans-Hudson Corporation, by its attorney Margaret TaylorFinucane, states pursuant to Local Civ. R. 56.1 the following material facts as to which it contends there is no genuine issue to be tried:

**A.  The Second Amended Complaint**

1.  Plaintiff, Anna McClement, commenced the instant action against Port Authority Trans-Hudson Corporation ("PATH"), a wholly owned subsidiary of The Port Authority of New York and New Jersey ("Port Authority"), by way of a Complaint, filed on November 21, 2011. *See* Docket Entry Document No. 1, Filed on November 21, 2011.

2.  Plaintiff filed a Second Amended Complaint on March 11, 2013.  *See* Docket Entry Document No. 19, Filed on March 11, 2013.

3.  The Second Amended Complaint alleges four separate Counts. *See Id*.

4.  Count One alleges that the PATH violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., "for unlawful discrimination in employment and in retaliation against Plaintiff for her having objected to such practices." *See Id*, p.7, ¶2[sic].

5.  Count Two alleges that PATH violated plaintiff's Constitutional rights of association, speech, petition and/or freedom of expression under the First Amendment of the United States Constitution was under the petition clause of the First Amendment. *See Id.*, p. 9 ¶7.

6.  Count Three alleges that PATH violated The Federal Employer's Liability Act, 45 U.S.C. 51, et seq. *See Id.*, p. 11, ¶9.

7.  Count Four alleges that PATH violated a provision of the Federal Railroad Safety Act,  49 U.S.C. 20109(a)(4) when it took actions "to suspend, discipline and/or discharge the Plaintiff in whole or in part due to her notification or efforts to notify the carrier of her work related injury/illness."  *See Id.,* p. 12, ¶11.

*(Remainder intentionally left blank)*

**B. PATH's Transportation Division, Relevant Job Positions And Responsibilities**

8.  In routine operations, one Engineer and one Conductor make up the crew of a passenger train. *See* Ex. 4, at 67:5-1, Ex. 5 at 23:8-20, and Ex. 51, at PATH 000874-6, attached to the Declaration of Thomas R. Brophy, Esq., sworn to on December 23, 2014 ("Brophy Dec.").

9.  A Conductor is responsible for opening/closing a train's doors, making announcements to keep passengers informed, ensuring proper signage and doing various mechanical checks on a passenger train. *See* Brophy Dec., Ex. 4, at 65:2-16, Ex. 5 at23:8-20, and Ex. 52 at PATH 000877-80.

10. An Engineer is responsible for operating the train. *See* Brophy Dec., Ex. 5, at 23:8-20, and Ex. 52 at PATH 000877-80.

11. A Conductor is not an Engineer's supervisor. *See* Brophy Dec., Ex. 4, at 66:19 - 67:4, and Ex. 5, at 80:10 – 81:9.

12. An Engineer is not a Conductor's supervisor. *See Id.*

13. Both Conductors and Engineers report to Trainmaster/Assistant Trainmasters, Dispatchers and Operation Examiners. *See* Brophy Dec., Ex. 1, at 120:19-22, Ex. 5, at l 24:10-16, 80:10 - 81:9.

14. The Trainmaster/Assistant Trainmaster is responsible for the overall management of the railroad in terms of actual train operation, including monitoring and maintaining train schedules, monitoring employees working in track areas, monitoring and maintaining the amount of equipment being utilized. *See* Brophy Dec., Ex. 1, at 50:23 – 51:4, Ex. 3, at 139:11 -140:3, Ex. 5, at 23:24 – 24:29.

15. A Dispatcher is responsible for monitoring train schedules, balancing equipment and giving instructions to train crews. *See* Brophy Dec., Ex. 5, at 81:18-22.

16. A Chief Operations Examiner/Operations Examiner is responsible for providing training to train crews, monitoring the overall performance of train crews, investigating accidents/incidents involving train crews and passengers, investigating system conditions and reporting findings to the Office of the Superintendent of Transportation. *See* Brophy Dec., Ex. 1, at 30:15- 31:16, Ex. 5, at 31:13-19, and Ex. 53, at PATH 000870-1.

17. Neither a Chief Operations Examiner nor an Operations Examiner can institute discipline against an Engineer and Mr. Avril never discusses with Ms. Holmes whether to institute discipline against employees. *See* Brophy Dec., Ex. 3, at 33:6-34:25, Ex. 5, at 43:19-20, Ex. 14, at PATH000966 (Article IX B 1), and Ex. 54, at PATH 000867-9.

18. The Superintendent of Transportation is responsible for the management of the Transportation Division, which consists of over 500 employees responsible for the overall operation of PATH. *See* Brophy Dec., Ex. 3, at 16:5-20, and Ex. 54, at PATH 000867-9.

19. A Superintendent has the authority to institute and issue discipline. *See* Brophy Dec., Ex. 3, at 33:6-34:25, Ex. 5, at 43:19-20, Ex. 14, at PATH000966 (Article IX B 1), and Ex. 54, at PATH 000867-9.

20. The Assistant Superintendent of Transportation is responsible for assisting the Superintendent in managing the Transportation Division, including training operations, collection of revenue, customer service at PATH stations, managing the operating and capital budget, as well as participating in collective bargaining with five unions.  *See* Brophy Dec., Ex. 4, at 21:14-24.

21. The Operations Analyst of the Transportation Division is responsible for coordinating maintenance and construction activity to minimize the impact on passenger service, analyzes service trends and makes recommendations on service improvement, as well as acting as the

4

Division's hearing officer during administrative investigations. *See* Brophy Dec., Ex. 4, at 48:7-22.

22. An Assignment Coordinator Clerk is responsible for filling in jobs that are vacant due to absences, i.e. vacation sickness and injury. *See* Brophy Dec., Ex. 5, at 66:16-21.

*(Remainder intentionally left blank)*

### C. PATH Book Of Rules, Relevant Rules

23. PATH maintains a Book of Rules that it provides to its employees. *See* Brophy Dec., Ex. 1,

    at 23:19-22 and Ex. 13, at PATH 000882-951.

24. PATH provides training to employees on the Book of Rules. *See* Brophy Dec., Ex. 1, at 23:4-

    7.

25. The Book of Rules, Amended Through 1/1/00 was in effect in 2011. *See* Brophy Dec., Ex. 1,

    at 24:3-9, Ex. 5, at 26:3-11, and Ex. 13, at PATH 000882-951.

26. Rule D. 5 of the Book of Rules, Amended Through 1/1/10, reads:

    "Employees must perform the basic functions of their position in an acceptable manner and must conduct themselves so as not to waste the assets of PATH in order to retain their employment."  *See* Brophy Dec., Ex. 13, at PATH 000890.

27. Rule E.1 of the Book of Rules, Amended Through 1/1/10, reads:

    "To enter or remain in the service, employees must be of good character and most not act with indifference or neglect, or neglect, or commit a dishonest, immoral, illegal, violent, insubordinate, disruptive, destructive or reckless act. They must conduct themselves at all times, whether on or off PATH property in such a manner as to not bring discredit upon PATH. *See Id.*

28. Rule E. 2 of the Book of Rules, Amended Through 1/1/10, reads:

    "Harassment in workplace is prohibited. Any employee(s) who engages  in harassment on the basis of race, sex, religion, age, national origin or disability shall be subject to discipline, up to an including dismissal from service.

    Sexul harassment includes, but is not limited to, creation or perception of a hostile work environment, unwelcome sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature.

    Pictures, writings and other graphic images that could cause others to feel sexually harassed are strictly prohibited.

    Any employee who is the victim of sexual harassment or witnesses an act or acts of sexual harassment should contact the Manager, Port Authority Office of Equal Opportunity (212-435-5556). All such communication shall be kept in the strictest confidence and investigated promptly.

6

The PATH harassment policy is located in Appendix I." *See Id.*, at PATH 000890, 000939-940.

29. Rule E. 5 of the Book of Rules, Amended Through 1/1/10, reads:

"The use of profane or indecent language in the transaction of business with customers or fellow employees is prohibited." *See Id.*, at PATH 000891.

30.  Rule J. 4 of the Book of Rules, Amended Through 1/1/10, reads:

"Employees are responsible for notifying their supervisors of their scheduled medical appointments or any changes thereto. Employees must also hand carry written notification of their medical disposition, as determined by the Office of Medical Services, to the person designated by their Division." *See Id.*, at PATH 000893.

31. Rule N. 9 of the Book of Rules, Amended Through 1/1/10, reads:

"In case of an injury to an employee while on duty, the employee must notify his Supervisor immediately following the injury, but no later than the end of the work tour.

If necessary, promptly obtain first aid or medical assistance for all injuries. As soon as possible thereafter, the injured employee must complete Part 1 of Form **TH-360 PATH Employee Occupational Injury Report**.

The Immediate Supervisor, upon notification of an employee injury, will render or practical assistance to the employee, determine the circumstances of the incident, and complete Part II of Form **TH-360 PATH Employee Occupational Injury Report**." *See Id.*, at PATH 000893 (emphasis in original).

*(Remainder intentionally left blank)*

**D. Agreement Between PATH And Brotherhood of Locomotive Engineers & Trainmen, Relevant Provisions**

32. Plaintiff was a represented member of the Brotherhood of Locomotive Engineers & Trainmen ("BLET"). *See* Brophy Cert., Ex. 1, at 52:24 – 53:2.

33. PATH and the BLET are parties to an agreement. *See* Brophy Cert., Ex. 14, at PATH 000952-995.

34. Article VII General Rules, Section F of the Agreement between PATH and the BLET, states, in relevant part:

"Medical examinations conducted by PATH shall be required of all employees as determined by PATH." *See Id.*, at PATH 000960.

35. Article IX Investigation and Discipline Appeals, Section B Investigation and Appeals, Subsection 1 of the Agreement between PATH and the BLET, states, in relevant part:

"Employees covered by this Agreement shall not be disciplined, suspended or discharged without a fair and impartial investigation. Such investigation shall be held within thirty (30) days after the occurrence. At least three (3) days prior to investigation, the employee involved will be notified in writing of the exact time and place the investigation will be held and the precise charge against him. Employees may be held out of service for major offenses pending investigation and decision. The Superintendent of Transportation or his designated representative shall render his decision within fifteen (15) days after the completion ofthe investigation and such decision shall be in writing." *See Id.*, at PATH 000966.

36. Article IX Investigation and Discipline Appeals, Section B Investigation and Appeals, Subsection 2 of the Agreement between PATH and the BLET, states, in relevant part:

"Should any employee covered by this Agreement feel he has been unjustly dealt with, he shall have the right of appeal by a duly accredited representative designated by the Brotherhood or an employee of his own choosing selected from the ranks of employees designated to handle such appeals. Appeals shall be made in writing within thirty (30) days of the date of the decision of the lower official and the official to whom the appeal is made shall grant the appellant employee a hearing within fifteen (15) days after the receipt of his appeal, and each official to whom an appeal is made shall render his decision in writing within twenty (20) days after the completion of the hearing. Newly discovered evidence relevant to the charge is admissible at such appeal." *See Id.*

37. Article IX Investigation and Discipline Appeals, Section B Investigation and Appeals, Subsection 3 of the Agreement between PATH and the BLET, states, in relevant part:

"Al all investigations and appeal hearings, the employee may be represented by a duly accredited representative designated by the Brotherhood or any employee of his own choosing selected from the ranks of employees covered by this Agreement. Such representative shall be accorded the right to present witnesses in defense of the employee involved, and may interrogate official or other witnesses of those who make the charge. At all investigations and appeal hearings, the employee involved and his representative shall be granted the right to present their contentions with respect to the offense involved and their defense thereto.

(a) All investigations and appeal hearings shall be held on the property of PATH or [the Port Authority], or such other place as may be mutually agreed on upon." *See Id.*, at PATH 000966-7.

38. Article IX Investigation and Discipline Appeals, Section B Investigation and Appeals, Subsection 4 of the Agreement between PATH and Locomotive Engineers & Trainmen, states, in relevant part:

"Time limits specified in the Agreement may be extended by mutual agreement between PATH and the Brotherhood." *See Id.*, at PATH 000967

39. Article IX Investigation and Discipline Appeals, Section B Investigation and Appeals, Subsection 7 of the Agreement between PATH and the BLET, states, in relevant part:

"The decision of the ultimate PATH appeal official referenced in paragraph B.2 above shall be final and binding unless within one year from the date of the decision on appeal, proceedings for the final disposition of the claim are instituted by the employee or his duly authorized representative and PATH is notified." *See Id.*

*(Remainder intentionally left blank)*

9

**E.  PATH's Practice Regarding Reporting Unusual Occurrences**

40. An Unusual Occurrence Report is a document that PATH uses when investigating accidents/incidents. *See* Brophy Dec., Ex. 1, at 31:2-9.

41. An Unusual Occurrence Report is intended to document accidents/incidents or get a written statement from an employee. *See* Brophy Dec., Ex. 5, at 41:9-14, 122:18-24.

42. Employees are required to fill out an unusual occurrence report with the information pertaining to the incident at question. *See Id.*, at 67:13-18.

43. A request to write an unusual occurrence report is not discipline. *See Id.*, at 122:18-24.

44. An employee who fails fill out a requested report commits insubordination. *See Id.*, at 133:8-18.

*(Remainder intentionally left blank)*

10

**F.  April 28, 2011 Incident Investigation and Appeal**

**April 28, 2011 Incident Investigation and Decision**

45. On May 24, 2011, Adrian Holmes, Superintendent of the Transportation Division, sent plaintiff a letter advising plaintiff that she was to appear for an investigation of the charges that she violated Rules D.5, E.1 and E.5 of the Path Book of Rules. *See* Brophy Dec., Ex. 15, at PATH 0000359.

46. The May 24, 2011 letter states, in relevant part:

"'… on April 28, 2011 while working as an Engineer you failed to notify Supervision that you took a restroom relief time upon arriving at 33rd Street Station on your 8:36AM Journal Square to 33rd Street Train, which resulted in unnecessary complications to train operations into and out of 33rd Street Station.'

'… on April 28, 2011 when directed to submit a report by Operations Examiner Matos in connection with your relief time; you engage in a confrontation using profane and indencent language and failed to submit a proper report upon request.'" *See Id.*

47. An investigation hearing regarding the charge that plaintiff violated Rules D.5, E.1 and E.5 of the Path Book of Rules was held on August 10, 2011. PATH ("Hearing I"). *See* Brophy Dec., Ex. 15, at PATH 000220-410.

48. On August 24, 2011, Superintendent Holmes sent plaintiff a letter finding the charges for violation of Rules D.5, E.1 and E.5 were sustained and plaintiff was assessed a discipline of twenty (20) work days suspension. *See* Brophy Dec., Ex. 16, at PATH 000013.

49. At her deposition, when asked what warranted a twenty work days suspension, Superintendent Holmes testified that the suspension was warranted because PATH is a very time sensitive and disciplined environment, and when employees are disruptive and insubordinate it creates issues for customers. *See* Brophy Dec., Ex. 3, at 104:17 – 105:8.

50. At her deposition, Superintendent Holmes testified that she had suspended employees for cursing, especially when an employee curses at a supervisor. *See Id.*, at 113:23-114:3.

**April 28, 2011 Incident Appeal and Decision**

51. On September 14, 2011, General Chairman of the BLET, Ralph Nunziato, sent a letter to Chief Labor Negotiator-PATH, Cynthia Bacon, requesting an appeal of Hearing I. *See* Brophy Dec., Ex. 17, at PATH 000019.

52. The appeal hearing took place on November 17, 2011, before Appeal Officer Michael Greene ("Hearing I Appeal"). *See* Brophy Dec., Ex. 18, at AM 000490-559.

53. On December 5, 2011, Appeal Officer Greene sent Chairman Nunziato a letter denying the BLET's appeal. *See* Brophy Dec., Ex. 19, at AM 000484-5.

54. Appeal Officer Greene's December 5, 2011 letter states, in relevant part:

"one particular point that was brought forward at the appeal was the allegation that [plaintiff] was being treated in a disparate manner. [Chairman Nunziato] on behalf of the BLE, presented one unrelated matter… I have reviewed that matter, and determined that PATH Superintendent Holmes appropriately verbally counseled the… individual involved." *See Id.*

55. Appeal Officer Greene's December 5, 2011 letter states, in relevant part:

"… [T]here have been several other instances in which PATH employees have been formally discipline for use of profanity in the work place." *See Id.*

56. Appeal Officer Greene's December 5, 2011 letter states, in relevant part:

"The facts presented in the current charge against [plaintiff] indicate that she disruptively used profane language in direct response to a supervisor's order, in front of multiple witnesses, and in the middle of the busy chaotic rush hour services. The case you referenced involving a different BLE member differed in all of the aforementioned facts." *See Id.*

57. The BLET further appealed Appeal Officer's Greene decision to the Public Law Board No. 5210, Case No. 46, Award No. 36. *See* Brophy Dec., Ex. 20.

58. The Public Law Board No. 5210 denied the BLET's appeal, stating:

"Based on the claimant's record, the Board finds the Carrier's disciplinary conclusions were appropriate." *See Id.*

59. Pursuant to the Agreement between PATH and the BLET, this appeal was final. *See* ¶40, *supra*.

*(Remainder intentionally left blank)*

13

**G. April 28, 2011 Incident Facts and Reporting**

**April 28, 2011 Incident General Facts**

60. Plaintiff was working as an Engineer on April 28, 2011. *See* Brophy Dec., Ex. 1, at 45:4-8, Ex. 15, at PATH 000377-80, Ex. 26, at PATH 001947-8, Ex. 27, at PATH 000851,  Ex. 28, at PATH 000850,  and Ex. 29, at PATH 001965-6,

61. Angelo Costa was a Conductor working with plaintiff on April 28, 2011. *See* Brophy Dec., Ex. 1, at 47:2-7, and Ex. 15, at PATH 000282 (63:13-17), 383.

62. James Garrison was an Assistant Trainmaster working during plaintiff's shift on April 28, 2011. *See* Brophy Dec., Ex. 1, at 199:19 – 200:1, and Ex. 15, at PATH 000269 (50:13-52:18), PATH  000375.

63. Timothy Harrington was a Trainmaster working during plaintiff's shift on April 28, 2011. *See* Brophy Dec., Ex. 1, at 199:19 – 200:1, and Ex. 15, at PATH 000374.

64. Chandra Matos was an Operations Examiner, working in the capacity of a Dispatcher, at PATH's Journal Square Station, during plaintiff's shift on April 28, 2011. *See* Brophy Dec., Ex. 1, at 199:7-13, and Ex. 15, at PATH 000312 (93:16-24), PATH 000382.

65. Clements Tesh, Tanya Lisa and Lawrence Powell were PATH employees working during plaintiff's shift on April 28, 2011. *See* Brophy Dec., Ex. 15, at PATH 000291 (72:11-14), PATH 000296 (77:8-14), PATH 000304 (85:13-17), PATH 000384-6.

66. At Hearing I, plaintiff, Costa, Garrison, Matos, Tesh, Lisa, Powell and Kevin Lejda, the Assistant Superintendent of the Transportation Division, served as witnesses.  *See* Brophy Dec., Ex. 15, at PATH 000220-410.

**April 28, 2011 Incident Facts Relating To Toilet Relief**

67. At Hearing I, when asked to describe the conditions of the railroad on the morning of April

28, 2011, Assistant Trainmaster Garrison stated:

"On the 28th of April we were running off of 1 and 2 Track at 33rd for most of the
rush hour due to a defective D rail on 3 Track. The signal department was working on
it at the time and normally we have three track to operate out of 33rd. We only had
two so both series had to operate of those two tracks, and we run roughly between
7:30 and 9:30 about 50 intervals up to that location in those two- hour periods." *See*
Brophy Dec., Ex. 15, at PATH 000268-9 (49:22-50:12).

68. At Hearing I, when asked to describe the events that took place on the morning of April 28,

2011 involving plaintiff, Assistant Trainmaster Garrison stated:

" Okay. On the 28th, like I sad previously, all the trains were going in and out using
both one and two tracks because of the missing –unable to use the third track at the
time. And when were going up there, if it was very, very tight with intervals we were
getting on the radio and telling crews to change ends quickly. Not all the crews but
maybe a half a dozen over the course of two hours we told that over the radio. We
sent a Tower Operator up to 33rd to operate 33rd manually so we can better streamline
the trains leaving there. We actually also took some annulments out of Journals
Square and Hoboken to alleviate some of the crowding at 33rd. Over the course we
adjusted the schedule. That date [plaintiff] was, I believe, working the collector train.
It makes two trips during the rush hour. On her last trip up there, she came in on 1
Track and we lined it right back out to leave. And after two or three minutes the train
wasn't moving. And when I called on the radio, I don't believe I got a response from
anybody to find out why it's not moving. And then I went on the box to the
dispatcher's booth to the phone – I don't remember if I used the box or the phone –
and I got the Tower Operator up in that location at the time. That might have been
about four minutes passed by then. I asked them can you see why 1 Track is not
moving, and he looked out his door and he came back and said the Engineer, I
believe, just walked up the stairs. You know, so at that particular time we dropped the
line up and we went with the train that was on 2 Track to have it leave. And we had a
train sitting outside R-4 X outside 33rd. The train left off 2 Track and then when
[plaintiff] came back, we lined that up. Now she made, I believe, the 9:01 interval out
of there and she's a schedule 58 I believe it is. And the reason why we did that is we
sent the other Journal Square train out earlier to make her set interval and pushed her
back. But the passengers that were originally on her train never actually moved trains
or never were told to move to a different train because we didn't have time to move
the passengers. Some of them may have because they saw it was leaving first." *See
Id.*, at PATH 000269-271 (50:20-52:18).

69. At Hearing I, when asked what he did once plaintiff's train was en route to Journal Square,

Assistant Trainmaster Garrison stated:

"I called the Dispatcher at Journal Square and I had asked for a report from the Engineer that was on the train…" *See Id.*, at PATH 000275 (56:12-18).

70. At Hearing I, when asked whether he normally orders a report from an employee that takes a

toilet relief or some sort of personal break on their tour, Assistant Trainmaster Garrison

stated:

"I only as for reports for toilet relief if I'm not notified ahead of time." *See Id.*, at PATH 000276-7 (57:23 -58:5)

71. At Hearing I, when asked the reason why he normally orders a report from an employee that

takes a toilet relief or some sort of personal break on their tour, Assistant Trainmaster

Garrison stated:

"Is because for toilet reliefs, you should be notified ahead of time this way we could make adjustments to our schedule or adjust what trains we can move in and out." *See Id.*, at PATH 000277 (58:6-12).

72. At Hearing I, when asked why plaintiff was being charged with rule violations, Assistant

Superintendent Lejda stated, in part:

"…[plaintiff] brought her train into 33rd Street and needed to go the bathroom. That in itself, is not an issue. But the problem came about where she didn't notify the Trainmaster that she had to leave the train and use the restroom. That's a common practice there familiar with all the employees." *See Id.*, at PATH 000241 (22:12-18).

73. At Hearing I, when asked when an employee would have to write a report for taking toilet

relief or personal breaks during their normal working day, Operations Examiner/Acting

Dispatcher Matos stated:

"If you didn't tell anybody that you were going." *See Id.*, at PATH 000316 (97:9-23).

74. It is PATH's practice that employees are to notify their supervisor before taking bathroom relief. *See* Brophy Dec., Ex. 5, at 25:7-28:14, 29:5-25, 136:13-16, Ex. 11, 11:6-18, and Ex. 15, at PATH 000277 (58:6-12), PATH 000241 (22:12-18), PATH 000316 (97:9-10).

75. At Hearing I,  when asked to describe what happened when plaintiff arrived on her 8:36 a.m. trip, plaintiff said:

"We pulled into 1 Track late. I switched ends. Charged my train. I looked at Angelo [Costa] and I said, Do [sic] you think I'll have a minute, at least a minute to use the bathroom. He said yes because they are going to let 3 Track and 2 Track go first because there were trains on 3 and 2. I said okay, I will be a few seconds. I ran up to use the bathroom. I used the bathroom and came right back down, and I was sitting on my train waiting for the signal."  *See* Brophy Dec., Ex 15, at PATH 000334-5 (115:17-116:7).

76. At Hearing I, when asked why plaintiff did not notify her supervisor before taking toilet relief, plaintiff said:

"I didn't realize there was a problem with it… I had to go so bad. So if I, well, I didn't realize I had to go so bad until we switched ends, so." *See Id.*, at PATH 000337-8 (118:21 - 119:3).

**April 28, 2011 Incident Facts Relating To Profane Language**

77. At Hearing I, when asked to describe her involvement with the incident which took place at Journal Square train dispatcher's office on the morning of April 28, 2911, Operations Examiner/Acting Dispatcher Matos stated:

"Okay. On April 28, I received a phone call from Assistant Trainmaster Jim Garrison. He told me that [plaintiff] took a toilet relief up at 33rd Street but they [sic] didn't notify anybody that she was going. They were having problems with 3 Track, so they were only using one and two. And so when she got back to Journal Square, I asked her how come she didn't let anybody know that she was going to the bathroom and that she needed to write a report at which time she cursed at me and that I was harassing her." *See* Brophy Dec., Ex. 145, at PATH 000317 (98:6-22).

78. At Hearing I, Operations Examiner/Acting Dispatcher Matos read aloud this portion of her April 28, 2011 Memorandum:

"On this date ATM Garrison informed me that [plaintiff], on the 33rd Journal Square 9:01 a.m., had taken a toilet relief at 33rd street but did not notify anybody of this fact. Upon her arrival at Journal Square, I asked her for an Unusual Occurrence Report. [Plaintiff's] response was that this is bullshit and harassment. I am going to write the report and contact my attorney and the EEOC. I then instructed [plaintiff] that her language was inappropriate and that she had to write a report for that also. Also present in the Dispatcher's booth was Conductor A. Costa, Yard Foreman, L. Powell, Tower Operator, T. Lisa…" *See Id.*, at PATH 000319 (100:7-19), PATH 000382.

79. At Hearing I, PATH employee Lisa stated that she was "about 10 to 15 minutes into the start of a cut down" when Operations Examiner/Acting Dispatcher Matos was interacting with plaintiff. *See Id.*, at PATH 000297 (78:2-7).

80. At Hearing I, PATH employee Lisa described a "cut down" as the process of taking rush hour trains out of service to send them to another location or for inspection that requires a lot of communication between several parties. *See Id.*, at PATH 000298 (79:2-13).

81. At Hearing I, PATH employee Lisa described the "cut down" as a "very busy" time in the Journal Square Dispatcher's booth. *See Id.*, at PATH 000298 (79:14-16).

82. At Hearing I, Engineer Costa and PATH employees Lisa and Powell stated that plaintiff said the word shit and/or bullshit and/or horseshit after being asked by Operations Examiner/Acting Dispatcher Matos to write an Unusual Occurrence Report. *See Id.*, at PATH 000284 (65:11-12), PATH 000297 (78:12-14), PATH 000305 (86:20-24).

83. At Hearing I, Engineer Costa and PATH employees Lisa and Powell read portions of their reports into the record which stated that plaintiff said the word shit and/or bullshit and/or horseshit after being asked by Operations Examiner/Acting Dispatcher Matos to write an Unusual Occurrence Report. *See Id.*, at PATH 000285-6 (66:12-67:2), PATH 000300-1(81:12-82:7), PATH 000307 (88:3-15), PATH 000383-5.

18

84. At Hearing I, when asked why plaintiff was being charged with rule violations, Assistant

Superintendent Lejda stated, in part:

"In this charge letter that is relevant to E.1 where we talk about a disruptive act, the time when [plaintiff] was in the Dispatcher's booth is very hectic at Journal Square cutting down train service from the rush hour. There's a lot of activity. It's a time when both the Dispatcher and the Foreman really need to focus on their work so that the cut down, as we call it, is orderly and effective, and train service can operate normally. It's certainly not the time or place for any kind of argument like this. The charging letter in E.5 as it pertains to this incident when asked to submit a report, [plaintiff] said, 'this is bullshit' at some point, and that's not appropriate language to use when conducting business. She may not have agreed with it, but it's not the type of language to use in this situation." *See Id.*, at PATH 000242-3 (23:24-24:17).

85. At Hearing I and her deposition, plaintiff admitted that she said bullshit on April 28, 2011 after being asked to write an Unusual Occurrence Report. *See* Brophy Dec., Ex. 1, at 192:23-193:18, and Ex. 15, at PATH 000338 (119:9-17), PATH 0001965-6.

86. At Hearing I and her deposition, plaintiff denied that the term "bullshit" is foul language. *See* Brophy Dec., Ex. 1, at 192:23-193:18, and Ex. 15, at PATH 000338 (119:9-17).

**Plaintiff's Unusual Occurrence Reporting of April 28, 2011 Incident**

87. Plaintiff filled out two Unusual Occurrence Reports dated and submitted on April 28, 2011 to

Operations Examiner/Acting Dispatcher Matos. *See* Brophy Dec., Ex. 1, at 190:24 – 191:18,

and Ex. 15, at PATH 000377-8.

88. One of the Unusual Occurrence Reports dated April 28, 2011, reads:

"Leaving JSQ I ran to 33rd st + every train was running latee [sic] got to 33rd. At 906 time leave 901 + ask conductor if I had time to use bathroom used bathroom ½ minute + still had to wait for congestion to leave. I find this request is harassing + being done in retaliation." *See* Brophy Dec., Ex. 15, at PATH 000377.

89. The second Unusual Occurrence Report dated April 28, 2011, reads:

"I was asked to write this report + I have no clue why." *See Id.,* at PATH 000378.

*(Remainder intentionally left blank)*

**H.  April 29, 2011 Incident Facts And Reporting**

**April 29, 2011 Facts**

90. Plaintiff was working on April 29, 2011. *See* Brophy Dec., Ex. 1, at 98:4-7, Ex. 26, at PATH 1947-8, Ex. 27, at PATH 000851, Ex. 28, at PATH 000850, Ex. 29, at PATH 001965-6.

91. Avril Astagne was working as the Chief Operations Examiner during plaintiff's shift on April 29, 2011. *See* Brophy Dec., Ex. 26, at PATH 1947-8, Ex. 27, at PATH 000851, Ex. 28, at PATH 000850, Ex. 29, at PATH 001965-6.

92. Carl Lupia was working as an Operations Examiner during plaintiff's shift on April 29, 2011. *See Id.*

93. At his deposition, Chief Operations Examiner Avril testified that Operations Examiner/Acting Dispatcher Matos forwarded him the two Unusual Occurrence reports dated April 28, 2011. *See* Brophy Dec., Ex. 5, at 89:13-15.

94. At his deposition, Chief Operations Examiner Avril testified that he concluded that plaintiff failed to address, in either of the two Unusual Occurrence reports dated April 28, 2011, Operations Examiner/Acting Dispatcher Matos' request that plaintiff address the language used during their interaction. *See Id.*, at 89:23 – 90:2.

95. Chief Operations Examiner Avril wanted to meet with plaintiff regarding this failure. *See* Brophy Dec., Ex. 5, 90:3-5, and Ex. 29, at PATH 001965-6.

96. Chief Operations Examiner Avril alerted a dispatcher to have plaintiff contact him. *See* Brophy Dec., Ex. 5, at 90:14-18, and Ex. 29, at PATH 001965-6.

97. Plaintiff contacted Chief Operations Examiner Avril. *See* Brophy Dec., Ex. 29, at PATH 001965-6.

98. Chief Operations Examiner Avril informed plaintiff that he wanted to speak with her in his office after her last trip. *See* Brophy Dec., Ex. 26, at PATH 1947-8, and Ex. 29, at PATH 001965-6.

99. Chief Operations Examiner Avril's office is a cubicle without a door. *See* Brophy Dec., Ex. 5, at 129:3-12.

100.    Plaintiff informed Chief Operations Examiner Avril that she had a doctor's appointment and had to leave right away to make it on time. *See* Brophy Dec., Ex. 26, at PATH 1947-8, and Ex. 29, at PATH 001965-6.

101.    At her deposition, plaintiff testified that she could not recall what doctor she had an appointment with and/or what doctors she was treating with in April, 2011. *See* Brophy Dec., Ex. 1, at 152:1 – 153:8.

102.    Plaintiff asked Chief Operations Examiner Avril why he needed to speak with her. *See* Brophy Dec., Ex. 26, at PATH 1947-8, and Ex. 29, at PATH 001965-6.

103.    Chief Operations Examiner Avril informed plaintiff that she needed to rewrite the Unusual Occurrence Reports. *See Id.*

104.    Plaintiff informed Chief Operations Examiner Avril that she had revised the Unusual Occurrence Reports. *See* Brophy Dec., Ex. 29, at PATH 001965-6.

105.    Plaintiff informed Chief Operations Examiner Avril that he could pick up the Revised Unusual Occurrence Reports when she arrived at the Journal Square Station. *See Id.*

106.    Chief Operations Examiner Avril contacted Operations Examiner Carl Lupia to request that he also meet at the Journal Square Station to speak with plaintiff. *See* Brophy Dec., Ex. 5, 95:18-96:11, and Ex. 27, at PATH 000850.

107.    At his deposition, Chief Operations Examiner Avril testified that he tries to have a

supervisor, as a witness, present whenever he speaks to employees. *See* Brophy Dec., Ex. 5,

at 55:17-24.

108.    Chief Operations Examiner Avril and Operations Examiner Carl Lupia met plaintiff on

Track 3, Journal Square. *See* Brophy Dec., Ex. 1, at 139:20 – 140:4.

109.    Plaintiff handed Chief Operations Examiner Avril her Revised Unusual Occurrence

Reports. *See Id.,* at 145:14-17.

110.    The first Revised Unusual Occurrence Report dated April 29, 2011 reads:

"I was told to write another report because after OE Matos asked me why i[sic] used
the bathroom, I got upset over this offensive question + stated this was pure
harassment + ~~bulling~~ bullying, and i[sic] still ~~felt~~ feel the same way except because
feel this way in retaliation I am to write this report. I will be filing a complaint with
NJ EEOC which will be forwarding this to PA of NYNJ legal dept. *See* Brophy Dec.,
Ex. 15, at PATH 000379

111.    The second Revised Unusual Occurrence Report dated April 29, 2011 reads:

"TM (Tim Harrington) + OE (C. Matos) acting Dispatcher wanted to know why I
used the bathroom, then she changed the question. Why did i[sic] use the bathroom
without telling anyone? This is pure assumption on T. Harrington and C. Matos part.
In answer to 1st question it is obvious + I find this question offensive. In response to
2nd Question standard operating procedures were followed according to the PATH
book of rules. I am putting T. Harrington + C Matos on notice to stop harassing +
bullying me for starters the question is offensive, the 1st day I am on the AM's I am
ordered to write a report which has nothing to do with my job performance. JSQ#59
3:30AM – 9:30AM. I am requesting that the 9th floor look at the video of 4-28-11
9:06AM – 9:11AM of 33rd St. also listen to phone call from T.M to dispatcher
9:11AM – 9:25AM in this regard also the raido [sic] transmission around 9:20AM –
9:25AM for Engineer 8460 to call as I am operating my train. I will be filing a
complaint with the NJ EEOC which will be forwarded to the PA of NYNJ legal
department." *See Id.*, at PATH 000380.

112.    At his deposition, Chief Operations Examiner Avril testified that he concluded that the

Revised Unusual Occurrence Reports still failed to address the language plaintiff used during

her interaction with Operations Examiner/Acting Dispatcher Matos.  *See* Brophy Dec., Ex. 5, at 100:2-8.

113.    At his deposition, Chief Operations Examiner Avril testified that he asked plaintiff to write a report "address her behavior and the language she used in the transacting of business with the dispatcher." *See Id.*, at 100:9-102:1.

114.    At his deposition, Chief Operations Examiner Avril testified that plaintiff's shift had not ended, giving her time write a report. *See Id.*, at 93:11-14.

115.    At his deposition, Chief Operations Examiner Avril testified that he offered to go to the Transportation Office in the Command Center of Hoban Tower. *See Id.*, at 95:3-6.

116.    At his deposition, Chief Operations Examiner Avril testified that plaintiff declined to go to the Transportation Office in the Command Center of Hoban Tower. *See Id.*, at 95:7-9.

117.    At his deposition, Chief Operations Examiner Avril testified that he then offered to go to the Operations Filed Office. *See Id.*, at 95:10-12.

118.    The Operations Field Office is located below the dispatcher's booth, between Tracks 1 and 2, and in the rear of the Crew Room. *See Id.*, at 137:4-24.

119.    The Crew Room has a bathroom, television, refrigerator, table and chairs.  *See Id.*

120.    At least two employees were in the Crew Room eating when plaintiff, Chief Operations Examiner Avril and Operations Examiner Lupia entered. *See Id.*, at 138:4-10

121.    The Operations Examiner Field Office has a computer workstation, telephone and supplies. *See* Brophy Cert., Ex. 1, at 150:3-24, Ex, 5, at 137:4-24, Ex. 26, Ex. 27, Ex, 28, and Ex, 29.

122.    Plaintiff alleges that Chief Operations Examiner Avril and Operations Examiner Lupia utilized pretext that they were walking plaintiff to copy the Revised Unusual Occurrence

reports when they led her to the Operations Examiner Field Office. *See* Docket Entry Document No. 19, Filed on March 11, 2013, p. 4, ¶26, and Brophy Dec., Ex. 1, at 136:10-17.

123.   Plaintiff alleges that Chief Operations Examiner Avril said that plaintiff had to come with him to make copies of the Revised Unusual Occurrence Reports or he would take plaintiff out of service for insubordination. *See* Brophy Dec., Ex. 1, at 145:14-25.

124.   At her deposition, plaintiff alleged that Chief Operations Examiner Avril touched her elbow to prevent her from leaving before entering the Operations Examiner Field Office. *See Id.*, at 140:12-17, 141:5-6, 144: 3-6,  144:19-21.

125.   Plaintiff alleges that Chief Operations Examiner Avril and plaintiff entered the Operations Examiner Field Office and Operations Examiner Lupia closed and blocked the door. *See* Brophy Dec., Ex. 1, at 148:5-149:2, Ex. 26, at PATH 001947-8, and Ex. 29, at PATH 01965-6.

126.   Plaintiff alleges that she demanded to leave, maybe a 100 times. *See* Brophy Dec., Ex. 1, at 149:8-14.

127.   Plaintiff alleges that Chief Operations Examiner Avril said "It's not what you want, it's what we want from you." *See* Brophy Dec., Ex. 1, at 149:3-25, Ex. 26, at PATH 001947-8, and Ex. 29, at PATH 01965-6.

128.   Plaintiff alleges that Operations Examiner Lupia said nothing. *See* Brophy Dec., Ex. 1, at 149:17-19, 158:15-19.

129.   Plaintiff then used the Operations Examiner Field Office phone to call Superintendent Holmes, Assistant Superintendent Lejda, and then Director Michael DiPaolo, but no one was available. *See* Brophy Dec., Ex. 1, at 150:3-24, Ex. 26, Ex. 27, Ex, 28, and Ex, 29.

130.    While plaintiff was on hold with Director Michael DiPaolo's office, she asked for the

door to be open. *See* Brophy Dec., Ex. 5, at 105:8-17, and Ex. 29, at PATH 001965-6.

131.    Operations Examiner Lupia opened the door. *See Id.*

132.    While plaintiff was on hold with Director Michael DiPaolo's office, she wrote an

Unusual Occurrence Report. *See* Brophy Dec., Ex. 29, at PATH 001965-6.

133.    The Unusual Occurrence Report dated April 29, 2011 that plaintiff wrote in the

Operations Examiner Field Office reads:

"Mr. Avril is making me write this report in duress after working all nite[sic]. I did
not use any foul language in front of anyone." *See* Brophy Dec., Ex. 15, at PATH
000381.

134.    Plaintiff alleges that she then tried to call 9-11, but Chief Operations Examiner Avril

hung up the phone on her. *See* Brophy Dec., Ex. 1, at 143:8-14, Ex. 26, at PATH 001947-8,

and Ex. 29, at PATH 001965-6.

135.    At her deposition, plaintiff testified that that when Chief Operations Examiner Avril hung

up the phone he touched/brushed/grabbed her breast. *See* Brophy Dec., Ex. 1, at 143:5-21.

136.    At her deposition, plaintiff testified that when Chief Operations Examiner Avril hung up

the phone he grabbed her hand. *See Id.*.

137.    Plaintiff alleges that Chief Operations Examiner Avril said "now we will bring you up on

charge for falsifying a report, we have your job now." *See Id.*, at 157:22-158:1.

138.    Plaintiff was not charged for falsifying any unusual occurrence reports related to the

April 28 and 29, 2011 incidents. *See*, ¶¶45-7, *supra.*

139.    Plaintiff then left the Operations Examiner Field Office. *See* Brophy Dec., Ex. 1, at

158:2-4, Ex. 26, at PATH 001947-8, and Ex. 29, at PATH 001965-6.

140.    Later in the day on April 29, 2011, Chief Operations Examiner Avril sent a Memorandum to and met with Superintendent Holmes. *See* Brophy Dec., Ex. 3, at 47:25-48:11, Ex. 5, at 112:24-113:14,  and Ex. 27, at PATH 000851.

141.    Later in the day on April 29, 2011, Operations Examiner Lupia sent a Memorandum to and met with Superintendent Holmes. *See* Brophy Dec., Ex. 3, at 47:25-48:11, Ex. 5, at 112:24-113:14,  and Ex. 28, at PATH 000850.

142.    At her deposition, Superintendent Holmes testified that she spoke with Chief Operations Examiner Avril and Operations Examiner Lupia separately and they both gave similar reports. *See* Brophy Dec., Ex. 3, at 47:25 - 48:11, 50:23-25.

143.    Neither Chief Operations Examiner Avril's nor Operations Examiner Lupia's Memorandums report that either gentleman physically touched plaintiff in anyway. *See* Brophy Dec., Ex. 27, at PATH 000851, and Ex. 28, at PATH 000850.

**Plaintiff's Report Of The April 29, 2011 Incident to Police**

144.    Later in the day on April 29, 2011, plaintiff provided a statement to The Port Authority Police, Criminal Investigative Bureau ("Police Statement"). *See* Brophy Dec., Ex. 26.

145.    At her deposition plaintiff testified that a union representative told her to file the report with the police. *See* Brophy Dec., Ex. 1, at 174:4-10.

146.    The Police report does not say that Chief Operations Examiner Avril touched her elbow to prevent her from leaving. *See* Brophy Dec., Ex. 26.

147.    The Police report does not say that when Chief Operations Examiner Avril hung up the phone he touched/brushed/grabbed her breast. *See* Brophy Dec., Ex. 26.

148.    The Police report does not say that when Chief Operations Examiner Avril hung up the phone he grabbed her hand. *See* Brophy Dec., Ex. 26.

149.    The Police report does not say that Chief Operations Examiner Avril or Operations Examiner Lupia physically touch plaintiff in anyway. *See* Brophy Dec., Ex. 26.

150.    Superintendent Holmes and Chief Operations Examiner Avril did not have knowledge of the police report prior to their respective depositions. *See* Brophy Dec., Ex. 3, at 155:10-22, and Ex. 5, at 126:9-12.

151.    There is no evidence in the record which demonstrated that Superintendent Fred Childs and Hearing Officer Greene have knowledge of the police report.

**Plaintiff's Report Of The April 29, 2011 Incident to Executive Director Christopher Ward**

152.    On or about May 3, 2011, plaintiff sent a letter to the Port Authority (then) Executive Director Christopher Ward. *See* Brophy Dec., Ex. 1, at 184:6-14, and Ex. 29, at PATH 001965-6.

153.    Plaintiff testified at her deposition that she wrote the letter to Executive Director Ward because his signature was on the Port Authority's Policies for sexual harassment and discrimination. *See* Brophy Dec., Ex. 1 at 173:1-15.

154.    In the letter to Executive Director Ward, plaintiff does not report that she had been physically touched by her supervisors. *See* Brophy Dec., Ex. 29, at PATH 001965-6.

155.    Superintendent Holmes, Assistant Superintendent Lejda and Chief Operations Examiner Avril did not have knowledge of the letter to Executive Director Ward prior to their respective depositions. *See* Brophy Dec., Ex. 3, at 155:6-9, Ex. 4, at 109:9-19, and Ex. 5, at 126:13-16.

156.    There is no evidence in the record which demonstrates that Superintendent Fred Childs and Hearing Officer Greene have knowledge of the letter to Executive Director Ward.

**Plaintiff's Report To The New Jersey Division On Civil Rights**

157.  On June 8, 2011, the EEOC Newark Area Office received a Charge of Discrimination,

Charge No.524-2011-00631, dated May 23, 2011 wherein plaintiff alleged that she was

discriminated against based on age and in retaliation when she was excluded from a

promotional roster. *See* Brophy Dec., Ex. 40.

158.  In Charge No. 524-2011-00631, plaintiff made no report of the April 29, 2011 incident.

*See Id.*

159.  On August 3, 2011, the EEOC Newark Area Office received a Charge of Discrimination,

Charge No. 524-2011-00796, dated August 1, 2011 wherein plaintiff alleged that she was

discriminated against based on sex, age and in retaliation when:

"On April 29, 2011, [plaintiff] was taken by two male supervisors into a room and
compelled to remain against [her]will in an effort to force [her] to change a work
report. On May 13, 2011, [plaintiff] was taken out of service in retaliation for filing a
written complaint to the Executive Director of [her] employer dated May 3, 2011,
within which [plaintiff] complained of the actions of those supervisors as being
sexual harassment and creating a sexually hostile work environment. [Plaintiff] also
believes that these actions were intended to be retaliation for [her] prior complaints
alleging age discrimination. These actions were in violation of [her] rights under Title
VII of the Civil Rights Act of 1964, as amended, sex (female), and age (51) under the
Age Discrimination in Employment Act of 1967." *See* Brophy Dec., Ex. 41.

160.  In charge No. 524-2011-00796, plaintiff does not report that she had been physically

touched by her supervisors. *See Id.*

161.  Assistant Superintendent Lejda and Chief Operations Examiner Avril did not have

knowledge of plaintiff's Charges of Discrimination. *See* Brophy Dec., Ex. 4, at 78:21-24, and

Ex. 5, at 126:4-7.

162.  At her deposition Superintendent Holmes testified that she was generally aware that

plaintiff had filed Charges related to failure to promote. *See* Brophy Dec., Ex. 3, at 10:5 –

11:7, 153:10-154:4.

163.   At her deposition Superintendent Holmes testified that she did not recall seeing Charge No. 524-2011-00796.  *See Id.*, at 71:19-73:2.

164.   At her deposition, Superintendent Holmes testified that the Port Authority's EEO Manager Stephanie Desire –Lewis sometimes calls her when a Charge is received to get information. *See* Certification of Stephanie Lewis-Desire, sworn to on December 23, 2014 ("Lewis-Desire Cert."), at ¶1, and Brophy Dec., Ex. 3, at 73:3-13, 153:10-154:4.

165.   At her deposition, Superintendent Holmes testified that Manager Lewis-Desire does not always call her regarding every Charge. *See* Brophy Dec., Ex. 3, at 73:3-13, 153:10-154:4.

166.   There is no evidence in the record which demonstrates that Superintendent Fred Childs and Hearing Officer Greene have knowledge of plaintiff's Charges of Discrimination.

**Plaintiff's Report to Port Authority's Office of Equal Employment Opportunity and Compliance**

167.   In mid-May, plaintiff spoke with PATH employee Stephanie Lewis-Desire by telephone. Lewis-Desire Cert., at ¶5.

168.   During the conversation, plaintiff never advised Manager Lewis-Desire that she was physically touched, grabbed, or assaulted by Chief Operations Examiner Avril. *See Id.*, at ¶6.

169.   During that conversation, plaintiff did not give Manager Lewis-Desire any indication that she was the subject of unlawful retaliation. *See Id.*, at ¶7.

**Plaintiff's Report To Dr. Novaky**

170.   Later in the day on April 29, 2011, Plaintiff contacted her treating psychologist, Cathy Novaky, Ph.D., and left a message that something had happened at work and requested a call back. *See* Brophy Dec., Ex. 12, at 132:5-12, and Ex. 42, at AM 001914.

171.   Plaintiff took a personal day on April 30, 2014. *See* Brophy Dec., Ex. 1, at 184:16-22, and Ex.46, at PATH 002511.

172.   Plaintiff went on a previously scheduled vacation to Florida from May 1st -8th. *See* Brophy Dec., Ex. 1, at 185:1-3, and Ex.46, at PATH 002511.

173.   On May 2, 2011, Dr. Novaky returned plaintiff's April 29, 2011 message. *See* Brophy Dec., Ex. 12, at 132:5-23, and Ex. 42, at AM 001914.

174.   Plaintiff telephonically reported to Dr. Novaky that on April 29, 2014, plaintiff had been frightened and intimidated by two work supervisors who put her in a room with them and blocked her exit, speaking harshly and threateningly to her. *See Id.*

175.   On May 2, 2011, plaintiff did not report to Dr. Novaky that she had been physically touched by her supervisors. *See* Brophy Dec., Ex. 12, at 134:20 – 135:16, and Ex. 42, at AM 001914.

176.   Plaintiff met with Dr. Novaky on May 9, 2011. *See* Brophy Dec., Ex. 12, at 135:17-19, and Ex. 42, at AM 001914.

177.   On May 9, 2011, plaintiff did not report to Dr. Novaky that she had been physically touched by her supervisors. *See* Brophy Dec., Ex. 12, at 138:1-21.

178.   At her deposition, Dr. Novaky testified that on May 9, 2011, Dr. Novaky telephoned PATH's Office of Medical Services and left a message for Dr. Whitley that: 1) plaintiff had been traumatized on the job; 2) Dr. Novaky does not recommend plaintiff return to work; 3) plaintiff had a scheduled appointment with Dr. Novaky next week; and 4) plaintiff was being referred to a physician. *See Id.*, at 142:6 – 143:22.

179.   At her deposition, Dr. Novaky testified that subsequently Dr. Whitley returned Dr. Novaky's call. *See Id.*, at 142:6 – 143:22.

180.    At her deposition, Dr. Novaky testified that on Dr. Whitely referred Dr. Novaky to Dr.

Francis of PATH's Office of Medical Services. *See Id.*, at 142:6 – 143:22.

181.    At her deposition, Dr. Novaky testified that on Dr. Novaky sought and received

plaintiff's permission to speak with Dr. Francis. *See Id.*, at 142:6 – 143:22.

182.    At her deposition, Dr. Novaky testified that on Dr. Novaky telephoned Dr. Francis and

left a message that: 1) plaintiff had been traumatized on the job; 2) Dr. Novaky did not

recommend plaintiff return to work; 3) plaintiff had a scheduled appointment with Dr.

Novaky next week; and 4) plaintiff was being referred to a physician. *See Id.*, at 142:6 –

143:22.

183.    Subsequently Dr. Novaky spoke with Dr. Francis. *See* Brophy Dec., Ex. 7, at 26:14-

28:10, and Ex. 12, at 142:6 – 143:22..

184.    Dr. Francis advised Dr. Novaky that plaintiff needed to call out sick and would be

ordered in to the Office of Medical Service for an evaluation with Dr. Francis. *See Id.*

185.    At her deposition, Dr. Novaky testified that Dr. Francis called this the necessary protocol

"to call out stress." *See* Brophy Dec., Ex. 12, at 142:6 – 143:22.

186.    At her deposition, Dr. Novaky testified that she telephoned plaintiff and gave her Dr.

Francis' feedback. *See Id.,* at 142:6 – 143:22.

187.    Dr. Novaky did not make an appointment for plaintiff with Dr. Francis at PATH's Office

of Medical Services. *See* Brophy Dec., Ex. 7, at 26:14-28:10, and Ex. 12, at 142:6 – 143:22.

**Plaintiff's Reporting of the April 29, 2011 Incident to OSHA**

188.    On or about September 14, 2011, plaintiff sent a letter to OSHA Supervisory Investigator

John Schreck.  *See* Brophy Dec., Ex. 30.

189.    The September 14, 2011 letter Supervisory Investigator Schreck plaintiff stated:

"I was taken by both male supervisors into a room and compelled to remain against my will in an effort to force me to change a work report." *See Id.*

190.    The September 14, 2011 letter to Supervisory Investigator Schreck does not state that she was physically touched by her supervisors. *See Id.*

191.    On November 1, 2011, plaintiff sat for an oral interview with Supervisory Investigator Schreck. *See* Brophy Dec., Ex. 32.

192.    During that oral interview with Supervisory Investigator Schreck plaintiff said:

"So my job was threatened and I did follow them, and we went over to 2 Track to the dispatcher's room which is on the bottom, I mean the OE's room which is on the bottom of the dispatcher's, and as I was, Mr. Avril walked in first and as I walked in behind him I realized there was no copy machine.  So I turned around to walk out but Carl Lupia closed the door and blocked it.  He's like 300 pounds, and he blocked the door.  And I told him I wanted to get out –
– and he refused to let me out –
– until I rewrote another report.  So they were forcing me to re-write a report –
– and, um, I was panicky and I grabbed the phone and I was trying to call for help but I, I just kept forgettin' to call 9-1-1.  It's the stupidest thing, but anyway.  Um, I re-wrote the report saying I was under duress and, uh, then Mr. Avril grabbed the report and he said, now we got your job.  We got you, now you're gonna be put on the street for insubordination, and then he told Carl to open the door.  So from that incident, um, I did call my union guy and I was askin' him what happened." *See* Brophy Dec., Ex. 30. (p. 3 4:32-5:19)

193.    During the oral interview with Supervisory Investigator Schreck plaintiff did not state that she was physically touched by supervisors. *See Id.*

**Plaintiff's Report of the April 29, 2011 Incident to BLET Ralph Nunziato**

194.    At his deposition, Chairman Nunziato testified that he did not believe that plaintiff had ever told him that she was physically touched. *See* Brophy Dec., Ex. 10, at 148:8-149:2.

195.    At his deposition, Chairman Nunziato testified that an employee reporting that a supervisor physically touched them would be something that he would remember. *See Id.*

196.    At his deposition, Chairman Nunziato testified: "If someone I was representing was manhandled or touched, yeah, I would find that very offensive. *See Id.*

197.     At his deposition, Chairman Nunziato testified that he if someone he represented was physically touched he would, "… demand some kind of an inquiry." *See Id.*

*(Remainder intentionally left blank)*

**I. PATH's Practice Regard Reporting An Injury On Duty**

198.    The reporting of an injury on duty is set-forth in Rule N. 9 of the Book of Rules,

Amended Through 1/1/10. See ¶31, *supra*.

199.    The reporting of an injury on duty must be done timely and with notice given to

supervisors.  See ¶31, *supra*, and Brophy Dec., Ex. 3, at 75:17-20, 81:6-13, 140:24 – 141-24.

200.    49 U.S.C. 20901, reads, in relevant part:

"Not later than 30 days after the end of each month, a railroad carrier shall file a report with the Secretary of Transportation on all accidents and incidents resulting in injury or death to an individual or damage to equipment or a roadbed arising from the carrier's operations during the month." *See* Brophy Dec., Ex. 55.

*(Remainder intentionally left blank)*

**J.  PATH's Practice When Employee Fails to Appear To The Office Of Medical Services**

201.    Article VII F of the Agreement between PATH and Plaintiff's union provides that PATH may require employees to appear for medical evaluations. See ¶34, *supra*.

202.    In unusual circumstances when an employee calls off sick, the Superintendent, Assistant Superintendent or supervisor may order the employee to appear at the Office of Medical Services for an evaluation. *See* Brophy Dec., Ex. 4, at 91:3-21.

203.    When an employee does not appear at the Office of Medical Services after being ordered in, Chief of the Office of Medical Services refers the employee to their superintendent for administrative disposition. *See* Brophy Dec., Ex. 6, at 54:23-25.

204.    When the Office of Medical Services refers an employee to their superintendent for administrative disposition, that employee is thereafter held out of service without pay pending disciplinary hearings. *See* Brophy Dec., Ex. 3, at 147:17 - 148:24.

*(Remainder intentionally left blank)*

35

### K. May 11, 2011 Incident Investigation and Appeal

**May 11, 2011 Incident Investigation and Decision**

205.    On May 24, 2011, Superintendent Holmes sent plaintiff a letter advising plaintiff that she

was to appear for an investigation of the charge that she violated Article VII-F of the

Agreement between PATH and the Brotherhood of Locomotive Engineers and Rule E.1 of

the Path Book of Rules. *See* Brophy Dec., Ex. 21, at PATH 000575.

206.    The May 24, 2011 letter states, in relevant part:

"'… in that you committed an insubordinate act when, after being ordered, you failed
to keep you scheduled medical appointment with the Port Authority Office of
Medical Services on Wednesday, May 11, 2011" *See Id.*

207.    An investigation hearing regarding the charge that plaintiff violated Article VII-F of the

Agreement between PATH and the Brotherhood of Locomotive Engineers and Rule E.1 of

the Path Book of Rules was held on August 12 and 17, 2011. PATH ("Hearing II"). *See*

Brophy Dec., Ex. 21, at PATH 000412-601.

208.    On August 30, 2011, Frederick Childs, the Superintendent of PATH Power, Signals, and

Communications Division, sent plaintiff a letter determining that the charges sustained and

assessing a sixty (60) work day suspension. *See* Brophy Dec., Ex. 22, at PATH 002295.

209.    At her deposition, Superintendent Holmes testified that she did not adjudicate the hearing

because she served as a witness. *See* Brophy Dec., Ex. 3, at 156:1-11.

210.    The August 30, 2011 letter from Superintendent Childs states:

"With consideration given to your employment and discipline history, as introduced
into the record by the Hearing Officer, you are hereby assessed a penalty of sixty (60)
work day suspension without pay, from May 12, 2011 to August 3, 2011 inclusive. I
further find that PATH is no liable for any additional time between the end of your
suspension and the date that you may return to service, following medical approval."
*See* Brophy Dec., Ex. 22, at PATH 002295.

36

211.    The employment and discipline history submitted at Hearing II demonstrates plaintiff

        was cited approximately ten times for rule violations prior to the April 28, 2011. *See* Brophy

        Dec., Ex. 21, at PATH 000600-1.

212.    At her deposition, Superintendent Holmes testified that she did not speak with

        Superintendent Childs regarding the sixty-work day suspension. *See* Brophy Dec., Ex. 3, at

        104:8-12.

**May 11, 2011 Incident Appeal and Decision**

213.    On September 14, 2011, General Chairman of the BLET, Ralph Nunziato, set a letter to

        Chief Labor Negotiator-PATH, Cynthia Bacon, requesting an appeal hearing. *See* Brophy

        Dec., Ex. 17.

214.    The appeal hearing took place on December 1, 2011 (Hearing II Appeal). *See* Brophy

        Dec., Ex. 23, at AM 560-622.

215.    On December 16, 2011, Appeal Officer Greene sent Chairman Nunziato a letter denying

        the BLET's appeal. *See* Brophy Dec., Ex. 24.

216.    Appeal Officer Greene's December 16, 2011 letter states, in relevant part:

        "review of the record, I noted that the timeline presented… specifically regarding [plaintiff's]
        alleged conversation with Dr. Fisher, is inconsistent with Carrier Exhibit M of the
        investigatory transcript. After considering this fact, as well as reviewing the entire record, I
        ultimately did not find [plaintiff's] testimony to be credible." *See Id.*

217.    The BLET further appealed Appeal Officer's Greene decision to the Public Law Board

        No. 5210, Case No. 47, Award No. 47. *See* Brophy Dec., Ex. 25, at PATH 000117.

218.    The Public Law Board No. 5210 denied the BLET's appeal and stated that the case was

        denied for the threshold issue presented in the companion Case No. 37, Award No. 37. *See*

        *Id.*

219.    The threshold issue presented in the companion Case No. 37, Award No. 37 was that the

demand for remedy is rendered moot because plaintiff was approved by the Railroad

Retirement Board for disability annuity benefits retroactive to April 29, 2011. *See* Brophy

Dec., Ex. 20.

*(Remainder intentionally left blank)*

**L.  May 11, 2011 Incident Facts and Reporting**

**May 9, 2010 Communications**

220.    On May 9, 2011 at approximately 2:58 p.m. Plaintiff called PATH Assignments to see if she had overtime opportunities. *See* Brophy Dec., Ex. 23, at AM 000581 (22:2-11), AM 000596.

**May 10, 2011, 1:05 p.m. Plaintiff Calls Off To Assignments**

221.    On May 10, 2011 at approximately 1:05 p.m., plaintiff called a PATH Assignments Coordinator, Debra Evans. *See* Certification of John Sisak, sworn to on December 23, 2014 ("Sisak Cert."), at ¶¶10-11 and attachment "1. Recorded on 10-May-2011 at 13.05.02".

222.    Plaintiff told Assignments Coordinator Evans that she was "calling out injury on duty until further notice."  *See Id.*

223.    Assignments Coordinator Evans advised plaintiff "No, you can't do that." *See Id.*

224.    Plaintiff asked "Then, what can I do?" *See Id.*

225.    Assignments Coordinator Evans told plaintiff, "if you were injured at work you should have gone to medical. You should have notified an OE, your dispatcher, then you go to medical. You can't just call IOD on your own." *See Id.*

226.    Assignments Coordinator Evans told plaintiff, "You cannot call yourself off IOD. You can call yourself off sick, but you cannot call yourself off IOD." *See Id.*

227.    Assignments Coordinator Evans told plaintiff, "You tell me 'I'm calling off sick, my estimated return to duty day is,' whatever day you decide you want to come back." *See Id.*

228.    Plaintiff told Assignments Coordinator Evans that she was calling off sick and her estimated return to duty date was a month and a half. *See Id.*

229.    The conversation then ended. *See Id.*

**May 10, 2011, 1:18 p.m. Plaintiff Advises Assignments Of A Scheduled Office Of Medical Services Appointment**

230.    At approximately 1:18 p.m., plaintiff called Assignments Coordinator Evans again. *See* Sisak Cert., at ¶¶10-11 and attachment "2. Recorded on 10-May-2011 at 13.18.24".

231.    Plaintiff told Assignments Coordinator Evans she had an appointment at the Office of Medical Services at Journal Square scheduled for May 10, 2011 and was advised to let Assignments know. *See Id.*

232.    Assignments Coordinator Evans requested that plaintiff advise Assignments if the scheduling appointment changed in location and/or scheduling. *See Id.*

233.    The conversation ended. *See Id.*

234.    At approximately 1:22 p.m., Assignments Coordinator Evans contacted the Office of Medical Services at Journal Square and confirmed plaintiff's appointment May 10, 2011 at 10 a.m. *See* Sisak Cert., at ¶¶10-11 and attachments "3. Recorded on 10-May-2011 at 13.22.27," "4. Recorded on 10-May-2011 at 13.23.05".

**May 10, 2011, 1:41 p.m. Plaintiff Advises Assignments That She Cancelled The Office Of Medical Services Appointment**

235.    At approximately 1:41 p.m., plaintiff called Assignments Coordinator Josette. Sisak Cert., at ¶¶10-11 and attachments "5. Recorded on 10-May-2011 at 13.41.37."

236.    Plaintiff told Assignments Coordinator Josette that she had a conflict with her doctor's appointments and was not keeping her May 10, 2001, 10 a.m. appointment with Dr. Francis. *See Id.*, and Brophy Dec., Ex. 1, at 321:16-19.

237.    Plaintiff had cancelled her 10 a.m. appointment with Dr. Francis. *See* Brophy Dec., Ex. 1, at 321:16-19.

238.    Plaintiff told Assignments Coordinator Josette, "I did this on my own. It wasn't triggered by anyone else telling I have to come in. " *See Id.*

239.    Assignments Coordinator Josette requested that plaintiff advise Assignments when the Office of Medical Services rescheduled the appointment. *See Id.*

240.    The conversation ended. *See Id.*

241.    Plaintiff had a 2:00 p.m. appointment with Konstantin Mouthis, Ph.D. Licensed Psychologist, in Clifton, New Jersey. *See* Brophy Cert., Ex. 1, at 255:13-257:21, Ex. 2, at 321:4-15, and Ex. 21, at PATH 000594.

242.    Plaintiff had scheduled the 2:00 p.m. appointment with Dr. Mouhtis in early May. *See* Brophy Cert., Ex. 2, at 255:13-257:21.

243.    Plaintiff chose to cancel the 10:00 a.m. appointment with Dr. Francis because she was not feeling well, although she had no mental restraints in not making the appointment. *See* Brophy Dec., Ex. 1, at 255:13-257:21, 320:24-321:3, Ex. 21 at PATH000539 (128: 11-25)and Ex. 23, at AM 000585-6 (26:7-27:20).

244.    In Hearing II Appeal, when asked if she chose to cancel the 10:00 a.m. appointment not because it was a conflict, but because she did not think it would be helpful to go, plaintiff stated: "Absolutely."  *See* Brophy Dec., Ex. 23, at AM 000585-6 (26:7-27:20).

245.    Plaintiff had not seen Dr. Mouhtis prior to the May 11, 2011 scheduled appointment. S*ee* Brophy Dec., Ex. 1, at 255:13-257:21, and Ex. 2, at 320:24-321:3.

246.    Dr. Mouhtis had not prescribed and/or suggested a treatment plan prior to the May 11, 2011 scheduled appointment. S*ee* Brophy Dec., Ex. 2, at 334:25-335:5.

247.    Plaintiff was referred to Dr. Mouthis by her union. S*ee* Brophy Dec., Ex. 1, at 83:9-23.

248.    Dr. Mouhtis saw plaintiff professionally a total of three visits. S*ee* Brophy Dec., Ex. 43.

249.    Dr. Mouhtis stopped seeing plaintiff when it was discovered that plaintiff was treating with another psychologist. *See Id.*

250.    Dr. Mouhtis was unable to formulate a definitive diagnosis and treatment plan for plaintiff.  *See Id.*

251.    Plaintiff met with Dr. Novaky on May 9, 2011. *See* Brophy Dec., Ex. 12, at 135:17-19, and Ex. 42, at AM 001914.

252.    At her deposition, Dr. Novaky testified that she would have not referred plaintiff to another psychologist. *See* Brophy Dec., Ex. 12, at 146:1-19.

253.    At her deposition, Dr. Novaky testified that there is a concern for two practitioners to treat a patients for the same condition. *See* Brophy Dec., Ex. 12, at 146:1-19.

254.    At her deposition, plaintiff testified that Dr. Novaky had not advised plaintiff that she was not well enough to travel to the appointment scheduled with Dr. Francis. *See* Brophy Dec., Ex. 2, at 335:21-336:11.

**May 10, 2011 - Management Decides To Order Plaintiff To Appear At Medical**

255.    Superintendent Holmes was advised that plaintiff had attempted to call off IOD and then called off Sick. *See* Brophy Dec., Ex. 3, at 75:17-20.

256.    Superintendent Holmes was advised that plaintiff was not going to attend the Office of Medical Service appointment she had scheduled for May 10, 2011. *See Id.*, at 82:9-12.

257.    At her deposition, Superintendent Holmes testified that she directed Assignments to call plaintiff and advise that plaintiff was being ordered to go to the PATH Office of Medical Services. *See Id.*

258.    At her deposition, Superintendent Holmes testified that she considered it her responsibility as a manger to figure out why plaintiff attempted to call off IOD following being out on vacation. *See Id.*, at 82:9-83:8.

259.    At her deposition, Superintendent Holmes testified that an alleged IOD gives rise to liability issues requiring immediate assessment of the situation. *See Id.*, at 83:1-8.

260.    At her deposition, Superintendent Holmes testified that an alleged IOD needs to be assessed immediately so that PATH can fix a hazard. *See Id.*, at 146:7147:9.

261.    At her deposition, Superintendent Holmes testified that an alleged IOD gives rise to the PATH mandate to fill out reports. *See Id.*, at 141:5-24.

262.    At her deposition, Superintendent Holmes testified that an alleged IOD or Sick call-of following a vacation concerns her because it may be that the employee is seeking to take a longer vacation. *See Id.*, at 143:5-23.

263.    At her deposition, Superintendent Holmes testified that she is charged with ensuring that employees do not abuse their sick time. *See Id.*, at 143:5-23.

264.    At her deposition, Superintendent Holmes testified that she ordered plaintiff to the Office of Medical Services because plaintiff was coming off vacation, attempted to call of injury on duty, called off Sick and Superintendent Holmes had a responsibility as a manager to figure out what was going on. *See Id.*, at 82:9-19, 146:2-12.

**May 10, 2011, 4:11-12 p.m. Attempts By Assignments To Reach Plaintiff**

265.    At approximately 4:11 p.m., an Assignments Coordinator left a message for plaintiff on her telephone, advising that she was ordered to attend an evaluation at the Office of Medical Services in New York, May 11, 2011 at 10 a.m. Sisak Cert., at ¶¶10-11 and attachment "6. Recorded on 10-May-2011 at 16.11.15."

266.    The  Assignments Coordinator requested plaintiff return the call. *See Id.*

267.    At approximately 4:12 p.m., an Assignments Coordinator left a message for plaintiff on her second telephone, advising that she was ordered to attend an evaluation at the Office of Medical Services in New York at 10 a.m. Sisak Cert., at ¶¶10-11 and attachment "7. Recorded on 10-May-2011 at 16.12.33."

268.    The  Assignments Coordinator requested plaintiff return the call. *See Id.*

269.    In Hearing II Appeal, plaintiff stated that she had received these voicemails. *See* Brophy Dec., Ex. 23, at AM 000589 (30:4-10).

270.    In Hearing II Appeal, plaintiff stated that she had returned the call to assignments. *See* Brophy Dec., Ex. 23, at AM 000589 (30:10-18).

271.    In Hearing II Appeal, it was stated that this return call was not reflected in the phone records provided by the BLET/plaintiff. *See Id.*

**May 10, 2011, 4:31p.m. Plaintiff Calls Office Of Medical Services**

272.    At approximately 4:31, plaintiff called the Office of Medical Services in New York and spoke with Dr. Fisher. *See* Brophy Dec., Ex. 1, at 259:22 – 260:6, and Ex. 21, at PATH 000446 (31:4-8), 000597.

273.    In Hearing II, when asked what plaintiff told Dr. Fisher, she stated:

"That there was a conflict in the doctor's appointment. He asked me what time the appointment was. I told him 2:00 p.m. He looked on his schedule. He said we don't have you on the 3:00 p.m. he said." *See* Brophy Dec., Ex. 21, at PATH 000446-7 (34:20 - 35:1).

274.    In Hearing II, Dr. Fisher stated that he did not recall speaking to plaintiff on May 10, 2011.  *See* Brophy Dec., Ex. 21, at PATH 0000455 (44:10-17).

**May 10, 2011, 4:40-42 p.m. Attempts By Assignments To Reach Plaintiff**

275.     In Hearing II, Superintendent Holmes stated that after she was made aware that plaintiff

informed assignments that she cancelled her 10:00 a.m. appointment to attend an

appointment with her own doctor, Superintendent Holmes  directed Assignments to call

plaintiff back and change appointment to 2:00 p.m. *See* Brophy Dec., Ex. 21, at PATH

000420-1 (9:10-10:11).

276.     In Hearing II, Superintendent Holmes stated "Once we found out she wasn't available at

ten, we made it at two to accommodate her." *See Id.*, at PATH 000429 (18:14-15).

277.     At approximately 4:40 p.m., an Assignments Coordinator left a message for plaintiff on

her telephone, advising that the evaluation at the Office of Medical Services in New York

had been reschedule to 2:00 p.m. Sisak Cert., at ¶¶10-11 and attachment "8. Recorded on 10-

May-2011 at 16.40.58."

278.     The Assignments Coordinator requested plaintiff return the call. *See Id.*

279.     At approximately 4:42 p.m., an Assignments Coordinator left a message for plaintiff on

her second telephone, advising that the evaluation at the Office of Medical Services in New

York had been reschedule to 2:00 p.m. Sisak Cert., at ¶¶10-11 and attachment "9. Recorded

on 10-May-2011 at 16.42.10."

280.     The  Assignments Coordinator requested plaintiff return the call. *See Id.*

281.     In Hearing II Appeal, plaintiff stated that she had received these voicemails. *See* Brophy

Dec., Ex. 23, at AM 000589 (30:4-10).

282.     In Hearing II Appeal, plaintiff stated that she had returned the call to assignments. *See*

Brophy Dec., Ex. 23, at AM 000589 (30:10-18); Ex. 1, at 260:13-17 & 330:18.

283.    In Hearing II Appeal, it was stated that this return call was not reflected in the phone records. *See Id.*

284.    At approximately 4:58 p.m., Superintendent Holmes sent a Memorandum to Dr. Fischer reading, in relevant part:

> Miss McClement has been on vacation since April 29. Today she called off sick until July 1, 2011. Initially she tried to call off IOD stating that supervision was aware of why she was calling off and saying she had an appointment at PA Medical tomorrow morning at 10:00 a.m. We are not aware of any accident involving Miss McClement nor has she filed a PA 360. All that we are aware of is that she had an incident on April 28 in which she allegedly left her train without notifying supervision, then she used profane language towards the supervisor when she was asked to prepare a report on the incident. The next day when she was asked about her failure to provide proper reports by another supervisor, she started making accusations and left saying she was going to the PAPD. A few days later, approximately May 3rd, she called Assignments asking for PA Medical's telephone number. However, she did not indicate to Assignments that she had a problem during that call. Miss McClement has been advised to report to your office at 233 Park Avenue South tomorrow at 2:00 p.m. *See* Brophy Dec., Ex. 21, at PATH 000590.

**May 11, 2011, 8:45-47 a.m. Attempts By Assignments To Reach Plaintiff**

285.    The next morning, May 11, 2011, at approximately 8:45 a.m., an Assignments Coordinator left a message for plaintiff advising her that she was ordered to report to the Office of Medical Services in New York at 2:00 p.m. Sisak Cert., at ¶¶10-11 and attachment "10.  Recorded on 11-May-2011 at 08.45.29."

286.    The  Assignments Coordinator requested plaintiff return the call. *See Id.*

287.    The next morning, May 11, 2011, at approximately 8:47 a.m., an Assignments Coordinator left a message for plaintiff her second telephone advising her that she was ordered to report to the Office of Medical Services in New York at 2:00 p.m. Sisak Cert., at ¶¶10-11 and attachment "10.  Recorded on 11-May-2011 at 08.47.13."

288.    The  Assignments Coordinator requested plaintiff return the call. *See Id.*

289.    In Hearing II Appeal, plaintiff stated that she had received these voicemails. *See* Brophy Dec., Ex. 23, at AM 000589 (30:4-10).

290.    In Hearing II Appeal, plaintiff stated that she had returned the call to assignments. *See* Brophy Dec., Ex. 23, at AM 000589 (30:10-18).

291.    In Hearing II Appeal, it was stated that this return call was not reflected in the phone records. *See Id.*

**May 11, 2011, 9:23 p.m. Plaintiff Calls The Office Of Medical Services**

292.    On May 11, 2011 at approximately 9:23 a.m., plaintiff called the Office of Medical Services in New York and spoke with Supervising Nurse Loretta Platero. *See* Brophy Dec., Ex. 21, at PATH 000540 (129:13-16), 000597.

293.    At Hearing II, when asked if plaintiff provided a reason for why she could not come to medical, Supervising Nurse Platero stated:

"[Plaintiff] said that she had a doctor's appointment and she wouldn't be able to make the appointment." *See* Brophy Dec., Ex. 21, at PATH 000506 (95:14-96:17).

294.    At Hearing II, when asked how she responded to plaintiff, Supervising Nurse Platero stated: "We offered to switch the appointment to the afternoon." *See Id.*

295.    At Hearing II, when asked how plaintiff responded to her offer to switch the appointment, Supervising Nurse Platero stated: "[Plaintiff] couldn't keep that appointment either." *See Id.*

296.    At Hearing II, when asked if plaintiff gave a reason why she could not keep the afternoon appointment, Supervising Nurse Platero stated: "She didn't have a way to get to the appointment." *See Id.*

297.    At Hearing II, when asked if plaintiff gave a medical reason why she couldn't come to the afternoon appointment, Supervising Nurse Platero stated: "No." *See Id.*

298.    At her deposition, Supervising Nurse Platero testified that she was directed that plaintiff could not cancel her appointment so she tried to reschedule it for the same day. *See* Brophy Dec., Ex. 8, at 64:17-21.

299.    At her deposition, Superintendent Holmes testified that she did not speak with Supervising Nurse Platero nor does she know who she is. *See* Brophy Dec., Ex. 3, at 87:14 – 88:13.

**May 11, 2011 Incident - The Office Of Medical Services Refers Plaintiff For Administrative Disposition**

300.    Plaintiff did not appear at the Office of Medical Services on May 11, 2011. *See* Brophy Dec., Ex. 21, at PATH 000591.

301.    Plaintiff did appear for a 2:00 p.m. appointment with Dr. Mouhtis on May 11, 2011. *See Id*., Ex. 21, at PATH 000594.

302.    On May 12, Dr. Fisher wrote a memorandum to Superintended Holmes advising her that plaintiff did not appear and referring the matter to administrative disposition. *See Id*., Ex. 21, at PATH 000591.

303.    At her deposition, Superintendent Holmes testified that after the Office of Medical Services advised her that plaintiff had not cooperated, she took administrative action. *See* Brophy Dec., Ex. 3, at 96:16-97:2.

304.    On May 13, 2011, Superintendent Holmes sent a letter to plaintiff confirming that she was being taken out of service for failure to report to the Office of Medical Service. . *See* Brophy Dec., Ex. 21, at PATH 000592.

**Plaintiff's Reporting of the May 11, 2011 Incident to OSHA**

305.  On or about September 14, 2011, plaintiff sent a letter to Supervisory Investigator John

Schreck.  *See* Brophy Dec., Ex. 30, at PATH 001426.

306.  The September 14, 2011 letter to Supervisory Investigator Schreck states:

"Upon [her] return [from vacation,] [plaintiff] called off sick May 10, 2011 and immediately ordered to a medical apt. in NY the next day May 11, 2011. They kept changing the apt. and finally cancelled the 10am apt. to 2pm, this was a conflict with my treating Dr's apt… OMS refused to reschedule me and wrote me up as a no show on the 10am apt. which had been changed." *See Id.*

307.  On October 7, 2011, plaintiff sent an email to Supervisory Investigator Schreck stating:

"The Co gave me a 10am apt and then cancelled it and changed it to 2pm which conflicted with my treating Dr." *See* Brophy Dec., Ex. 31, at AM 000650.

308.  On November 1, 2011, plaintiff sat for an oral interview with Supervisory Investigator

Schreck in which she stated, in part:

I was wondering when it, uh, is conflicting, a doctor's appointment is conflicting, I thought that my treating doctor would take precedence… And I do believe they violated OSHA with the treating doctor and their, 'cause, cause, here's my point with that. What if I blew off the treating doctor and I went to their doctor and because he's only an administrative doctor, he says there's no reason you should be out of work. I think you can work. And they can rightfully say that. Then what? Where's the reasonableness of that? *See* Brophy Dec., Ex. 32.

309.  During the oral interview plaintiff stated:

" Uh, okay, the doctor's appointment with Dr. Francis was on May 11 at 10:00 .a.m.

And because the incident had happened in Journal Square I couldn't, I couldn't be in Journal Square.  I was too freaked out about it.

So I, um, I did, uh, cancel that appointment.  That was an appointment made, my doctor made." *See Id.*, at 14:10-43/p. 9.

310.  During the oral interview plaintiff stated:

"… and if they didn't change the 10:00 appointment to 2, I possibly could have made that 10:00 in New York…" *See Id.*, at 31:55-32:05/p. 24.

311.   On or about November 4, 2011, OSHA requested that PATH position statement to plaintiff's OSHA complaint. *See* Brophy Dec., Ex. 33.

312.   The OSHA worksheet, run date November 4, 2011, states, in part:

"[Plaintiff] says that she was suspended without pay because her appointment with a PATH doctor conflicted with her appointment to see her treating physician." *See Id.*

313.   PATH's response to OSHA's request for its position statement states, in part:

"We understand the gravamen of the complaint in this matter to be: *[Plaintiff] says that she was suspended without pay because her appointment with a PATH doctor conflicted with her appointment to see her treating physician…" See* Brophy Dec., Ex. 34.

*(Remainder intentionally left blank)*

50

**M. Delays In Scheduling Investigations And Appeals**

314.    Hearing I and II were scheduled for May 21, 2011. *See* Brophy Dec., Ex. 21, at PATH 000576.

315.    At the request of the BLET, Hearing I and II were rescheduled to July 21 and 22, 2011 with the understanding that plaintiff would remain out of service without pay pending resolution of the charges.  *See Id.,* at PATH 000576-7.

316.    PATH granted this request so that the Office of Medical Services could verify the medical documentation alleging that plaintiff could not attend the hearings at the noticed location. *See Id.*

317.    On July 13, 2011, Superintendent Holmes sent Chairman Nunziatio a letter advising that PATH would accommodate the BLET's request to have the hearings at an alternate location. *See Id.,* at PATH 000577.

318.    On July 20, 2011, Superintendent Holmes sent Chairman Nunziato a letter advising that PATH, consented to adjourning Hearing I and Hearing II to August 1 and 2, 2011, to allow plaintiff to submit medical documentation for her treating physician demonstrating why, in their professional opinion(s), plaintiff was unable to participate in the hearings. *See Id.,* at PATH 000581.

319.    In Superintendant Holmes July 20, 2011 letter it states:

> "…that the Agreement between PATH and the Brotherhood sets forth time limits intended to progress investigations and the discipline process expeditiously. Therefore, notwithstanding a claim of inability to participate, the Carrier expects that the investigations into alleged rule violations will comport with the negotiated time limits and procedural protocols set forth in the Agreement. The investigatory hearings will proceed without further delay and will be held, as scheduled, even if [plaintiff] chooses not to attend. PATH will not be liable for back pay demands occasioned by [plaintiff's] inability to comply with the contractual process." *See Id.*

320.   On July 29, 2011, Superintendent Holmes sent Chairman Nunziato a letter advising that the medical documentation provided by plaintiff's treating physicians was considered insufficient by the Office of Medical Services to demonstrate that plaintiff was unable to participate in the hearings at the alternate location. *See Id.,* at PATH 000582.

321.   Superintendent Holmes' July 29, 2011 letter indicates that it would be inappropriate for plaintiff to appear at the hearings by conference call. *See Id.*

322.   Superintendent Holmes' July 29, 2011 letter indicates that PATH allowed final postponement of Hearing I and Hearing II to August 10 and 12, 2011, respectively, at the alternate location.  *See Id.*

323.   Superintendent Holmes' July 29, 2011 letter states that PATH "will not be held liable for back pay or other demands occasioned by [plaintiff's] continued failure to comply with the time limits set forth in the contractual discipline process." *See Id.*

324.   Following Chairman Nunziato's request for an appeal of Hearing I and Hearing II, Hearing I and Hearing II Appeals were scheduled for September 28, 2011, in Newark. *See* Brophy Dec., Ex. 18, at AM 000545, and Ex. 23, at AM 000613.

325.   Hearing I, was adjourned at the BLET's request to November 17, 2011. *See* Brophy Dec., Ex. 18, at AM 000544, AM 000553.

326.   Hearing II, was adjourned at the BLET's request to December 1, 2011. *See* Brophy Dec., Ex. 23, at AM 000614-6.

*(Remainder intentionally left blank)*

**N.  September – December, 2011 Out of Service Sick And Railroad Retirement Disability Payments**

327.    Plaintiff was taken out of service without pay on May 12, 2011 pending the resolution of Hearing II. See ¶ 303, *supra*.

328.    Plaintiff applied for Railroad Retirement Disability on June 22, 2011. *See* Brophy Dec., Ex. 2, at 353:6-9.

329.    Hearing II was resolved by August 30, 2011. See ¶210, *supra*.

330.    As part of the discipline issued in Hearing II, Superintendent Childs advised plaintiff that PATH would not be liable for days missed between August 30, 2011 and when plaintiff reported to the Office of Medical Services due to delays in scheduling Hearing II. See ¶210, *supra*.

331.    Plaintiff appeared at the Office of Medical Service on September 12, 2011. *See* Brophy Dec., Ex. 44, at AM 000398.

332.    On September 12, 2011, the Office of Medical Services found plaintiff not fit for duty and held plaintiff out sick. *See Id.*

333.    Plaintiff remained out sick until December 11, 2011. *See* Brophy Dec., Ex. 46.

334.    Plaintiff was paid by PATH, pursuant to the Agreement between PATH and the BLET, while she was out service sick between September 12, 2011 and December 11, 2011. *See* Brophy Dec., Ex. 32 PATH 41:40-42:00/pp. 32-3.

335.    During the oral interview with Supervising Investigator Shrek on November 1, 2011 plaintiff stated:

"Shreck:    But you're being paid now, right?  You're out on sick?

Plaintiff:    – can you believe that?  I didn't, this is how it normally is.  You have to go back to work one day, call out sick and they start paying you.  That's how it normally works.  I've never been back –

Shreck:       Okay.
Plaintiff:    – they just started paying me." *See Id.*

336.    Also on November 1, 2011, the Railroad Retirement Board sent plaintiff a letter which

stated:

"We have determined that you meet the requirements for a disability annuity. We
have established a railroad retirement onset date of April 29, 2011 in your case.
Under the law, a disability annuity cannot begin earlier than the first date of the sixth
month following the month in which the onset of disability occurs or earlier than the
day after your last day of railroad compensation… We are in the process of
calculating your annuity. Your first payment should be issued in the next 20 days."
*See* Brophy Dec., Ex. 47, at AM 000401-2.

337.    Payment records for plaintiff from the Railroad Retirement Board, Retirement Benefit

Division reflect that plaintiff received payments for a period beginning on October 1, 2011,

and ending on November 30, 2011. *See* Brophy Dec., Ex. 48.

338.    Payment records for plaintiff from the Railroad Retirement Board, Retirement Benefit

Division reflect that plaintiff continued to receive payments for a period beginning on

December 1, 2011, and ending on December 30, 2011. *See Id.*

339.    On December 14, 2011, plaintiff attempted to return to work and the Office of Medical

Services found plaintiff fit for duty. *See* Brophy Dec., Ex. 2, at 353:15-17, Ex. 45, and Ex.

46.

340.    When plaintiff was cleared by the Office of Medical Services to return to work following

her absence due to illness, PATH scheduled plaintiff to serve her twenty work day

suspension issued by Superintendent Holmes. *See* Brophy Dec., Ex. 49.

341.    At her deposition, plaintiff testified that PATH was advised that plaintiff was taking a

Railroad Retirement Board disability annuity in January of 2012. *See* Brophy Dec., Ex. 2, at

356:22-24

342.   It is and has been PATH policy that when a BLET employee accepts a Railroad
Retirement Board disability annuity, that employee is retired from PATH and no longer
employed by PATH. *See* the Certification of Cynthia Bacon, sworn to on December 19, 2014
("Bacon Cert."), at ¶4.

343.   At her deposition, when asked if she knew what PATH's policy as to whether an
employee remains an employee when filing for a Retirement Board disability annuity,
plaintiff testified that she did not know. *See* Brophy Dec., Ex. 2, at 354:12-17.

344.   It is and has been PATH policy that once an employee accepts a Railroad Retirement
Board disability annuity, the employee cannot return to service as a PATH employee as a
matter of right. *See* Bacon Cert., at ¶5.

345.   It is and has been PATH practice that when an individual accepts a Railroad Retirement
Board disability annuity their name is not put on a Job Pick List. *See* Brophy Dec., Ex. 10, at
147:5-8.

346.   Plaintiff alleges that her name was removed from the Job Pick List on or about December
28, 2011.  *See* Brophy Dec., Ex. 2, at 350:11-21.

347.   Plaintiff alleges that removal from the Job Pick List constituted being fired. *See Id.*

348.   Plaintiff denies that being taken from the Job Pick List has anything to do acceptance of a
Railroad Retirement Board disability annuity. *See Id.*

349.   It is PATH and the BLET's practice that when an individual accepts a Railroad
Retirement Board disability annuity their name remains on the seniority roster. *See* Brophy
Dec., Ex. 10, at 146:20-24

350.   Plaintiff's name was on the 2011, 2012, 2013 and 2014 BLET Seniority Rosters. *See*
Brophy Dec., Ex. 50.

**O.  Danielle Coyle, Robert Coyle and Susan Shaw**

351.    Danielle Coyle is a Conductor at PATH. *See* Brophy Dec., Ex. 11, at 9:16-23.

352.    At her deposition, Conductor Coyle testified that she made complaints to her union regarding and incident wherein she alleges Chief Operations Examiner Avril told her to rewrite a report in a conference room. *See Id.*, at 30:9-34:12.

353.    At her deposition, Conductor Coyle testified that her union representative was with her and Chief Operations Examiner Avril in the conference room . *See Id.*

354.    At her deposition, Conductor Coyle testified that she was closer to the exit in the conference room than Chief Operations Examiner Avril. *See Id.*, at 34:18-24.

355.    At her deposition, Conductor Coyle testified that she felt intimidated by Chief Operations Examiner Avril in the conference room. *See Id.*, at 40:6-11.

356.    At her deposition, Conductor Coyle testified that she suffers from generalized anxiety disorder and had a panic attack. *See Id.*, at 35:24-1.

357.    At her deposition, Conductor Coyle testified that Chief Operations Examiner Avril told her to change an Unusual Occurrence Report or she would be charged with insubordination. *See Id.*, at 35:2 – 38:2.

358.    At her deposition, Conductor Coyle testified that she did not change her Unusual Occurrence Report. *See Id.*, at 35:2 – 38:2.

359.    At her deposition, Conductor Coyle testified that she was not brought up on insubordination. *See Id.*, at 35:2 – 38:2.

360.    At her deposition, Conductor Coyle testified that she has never filed any formal complaints against any PATH supervisors for any of their actions. *See Id.*, at 32:5-8.

361.     At her deposition, Conductor Coyle testified that her husband, Robert Coyle (male), told Assistant Superintendent Lejda that Chief Operations Examiner Avril held Conductor Coyle in room. *See Id.*, at 114:11-115:2.

362.     At her deposition, Conductor Coyle testified that Dispatcher Susan Shaw (female) was not disciplined for using the word "fucking" directed at a subordinate. *See Id.*, at 56:16 – 57:10.

363.     At her deposition, Conductor Coyle testified that  Chief Operations Examiner Avril ordered her husband to write a report when he used the word "shit." *See Id.*, at 52:10-19.

364.     At her deposition, Conductor Coyle testified that Chief Operations Examiner Avril held her husband in a room twice. *See Id.*, at 63:17-21.

365.     At her deposition, Conductor Coyle testified that her husband no longer works at PATH because PATH believed her husband falsified his injury.  *See Id.*, at 76:1-77:16.

366.     At her deposition, Conductor Coyle testified that her husband was seen by a PATH investigator trying to "take a swing" at a softball game according to his doctor's orders while he was out of service sick. *See Id.*, at 76:1-77:16.

367.     At his deposition, Assistant Superintendant Lejda testified that he has never had any employee make a complaint to him that Chief Operations Officer Avril acted in an intimidating manner towards the employee, such has holing them in a room. *See* Brophy Dec., Ex. 4, at 73:3-13.

368.     At her deposition, Superintendent Holmes testified that she was not aware of Conductor Coyle's allegations that Chief Operations Examiner Avril kept her in a room until being advised by counsel prior to her deposition in this matter. *See* Brophy Dec., Ex. 3, at 65:1-24

369.    At her deposition, Superintendent Holmes testified that she was not aware of any females other than plaintiff complaining of Chief Operations Examiner Avril keeping them in a room. *See* Brophy Dec., Ex. 3, at 65:1-24.

*(Remainder intentionally left blank)*

## P. Prior EEOC Charges of Discrimination

370.    In 2008, plaintiff filed Charge No. 524-2008-01507 alleging sex and age discrimination alleging that she was wrongfully found not to meet the requirements for promotion to Operations Examiner based on prior discipline. *See* Brophy Dec., Ex. 35.

371.    Plaintiff initiated litigation with respect to Charge No. 524-2008-01507 and on November 20, 2012,  the Third Circuit affirmed the District Court's grant of summary judgment in favor of PATH. *See McClement v. Port Auth. Trans-Hudson Corp.*, No. CIV.A. 09-522 SRC, 2011 WL 2600738, at *1 (D.N.J. June 29, 2011) *aff'd sub nom. McClement v. Port Auth. Trans-Hudson*, 505 F. App'x 158 (3d Cir. 2012), and Brophy Dec., Ex. 36.

372.    In 2009, plaintiff filed Charge No. 524-2009-00361 alleging sex and age discrimination, as well as retaliation and harassment for being denied a promotion to Operations Examiner. *See* Brophy Dec., Ex. 37.

373.    On March 3, 2010, the EEOC Newark Office received a Charge of Discrimination, Charge No. 524-2010-00186, dated March 1, 2010 wherein plaintiff alleges age discrimination, as well as retaliation and harassment for being denied a promotion to Operations Examiner. *See* Brophy Dec., Ex. 38.

374.    On December 15, 2010, the EEOC Newark Office received a Charge of Discrimination, Charge No. 524-2010-01075, wherein plaintiff alleges that she was discriminated against based on age and in retaliation for being denied a promotion to Operations Examiner. *See* Brophy Dec., Ex. 39.


*(Remainder intentionally left blank)*

Dated:      New York, New York
               December 30, 2014

                              Respectfully yours,
                              MARGARET TAYLOR FINUCANE, ESQ.
                              *Attorney for Defendant*
                              Port Authority Trans-Hudson Corporation

                              By:    s/ Thomas R. Brophy
                              Thomas R. Brophy, Esq.
                              225 Park Avenue South, 13th Floor
                              New York, New York 10003
                              Telephone: (212) 435-3415

To:    D. Gayle Loftis, Esq.
        *Attorney for plaintiff*
        210 River Street, Suite 32
        Hackensack, NJ 07601